CENTER FOR AUTO SAFETY,
Plaintiff,

v.

NATIONAL HIGHWAY TRAFFIC
SAFETY ADMINISTRATION,
Defendant,

American Honda Motor Ltd., et
al., Intervenor–Defendants.

No. Civ. A. 99–1759GK.

United States District Court,
District of Columbia.

Feb. 28, 2000.

Alison Van Horn, Michael Tankersley, Michael Kido, Public Citizen Litigation Group, Washington, DC, for plaintiff.

Lisa Sheri Goldfluss, U.S. Attorney's Office, Washington, DC, for NHTSA.

Erika Z. Jones, Adam Sloane Mayer, Brown & Platt, Washington, DC, for intervenor-defendants.

Karen Louise Manos, Robert Huey, Howrey & Simon, Washington, DC, for Toyota.

Scott Kragie, Andrew Cohen, Squire, Sanders & Dempsey, LLP, Washington, DC, for TRW and Bosch.

Christopher Grigorian, Arent Fox Kintner Plotkin & Kahn, PLLC, Washington, DC, for Takata.

## *MEMORANDUM OPINION*

KESSLER, District Judge.

Plaintiff Center for Auto Safety ("Plaintiff" or "CAS") brings this case under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), seeking information from Defendant National Highway Traffic Safety Administration ("NHTSA"), and the Intervenor–Defendant automobile manufacturers and their suppliers, in order to formulate its comments to NHTSA's proposed rule regarding air bags. The final rule upon which Plaintiff wishes to comment is scheduled to be published by March 1, 2000. This matter is before the Court on the parties' cross-motions for summary judgment [# 59, # 74, # 76, # 78, # 80, # 90], as well as Plaintiff's Motion to Strike [# 95]. Upon consideration of the motions, oppositions, replies, the voluminous exhibits, and the entire record herein, for the reasons discussed below, Plaintiff's Motion to Strike [# 95] is **denied,** Plaintiff's Motion for Summary Judgment [# 59] is **denied,** and the Defendant's and Intervenor–Defendants' cross-motions for summary judgment [# 74, # 76, # 78, # 80, # 90] are **granted.**

### I. *Procedural History*[1]

On December 17, 1997, NHTSA issued an Information Request ("IR") to nine automobile manufacturers and importers, asking them to provide information on the air bag systems installed in vehicles manufactured or imported into the United States for model years ("MY") 1990–98. The manufacturers were directed to respond by February 17, 1998. NHTSA

---

1. Pursuant to Local Civil Rule 7.1(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Thus the Court takes these facts from the parties' statements of material facts not in dispute. Unless otherwise noted, the Court states only uncontroverted facts.

subsequently posted some of the information provided by the manufacturers on the Department of Transportation's Internet website.

On January 19, 1999, Plaintiff requested, by letter and pursuant to the FOIA, all material responsive to the IR that was not already public through the Department of Transportation's Internet website. On February 16, 1999, NHTSA responded with a letter indicating that all the information Plaintiff requested was being withheld pursuant to Exemption 4 of FOIA, 5 U.S.C. § 552(b)(4).

On March 10, 1999, Plaintiff appealed NHTSA's determination, and on June 18, 1999, NHTSA granted in part and denied in part Plaintiff's appeal. NHTSA released some of the information Plaintiff sought, but continued to withhold many of the items in question in this litigation.

On June 29, 1999, Plaintiff filed this suit. All nine automobile manufacturers, as well as three suppliers who specialize in air bag components, have since joined as Intervenor–Defendants. Between the time the suit was filed and January 7, 2000, when all motions were fully briefed, NHTSA and the manufacturers have released some of the information that Plaintiff seeks. However, there are 33 items of information remaining (falling within 6 general categories) for which at least one manufacturer still claims an exemption.

## II. *Information Sought*

Plaintiff seeks disclosure of all of the following information submitted by the manufacturers in response to NHTSA's IR. These 33 items of information fall within the following six general categories: air bag deployment, air bag cover, air bag system components, seatbelts, crash sensors, and system performance.[2]

2. The explanations of items that follow were taken from the declarations of D. Theodore

## A. Air bag Deployment

1. **A.1.a.(3)—Whether air bag module is designed to move away from the occupant at time of deployment, and if so, how far.**

This item asks whether the air bag is designed to move away from the driver at the time it deploys, that is, further into the steering column, or further into the instrument panel.

The following manufacturers still claim an exemption to this item of information: DaimlerChrysler (MY 96–98), Nissan (MY 96–98), and Volvo (MY 96–98).

2. **A.1.b.(4)—For passenger air bags, whether the air bag module is designed to move away from the occupant at time of deployment, and if so, how far.**

This item asks whether the passenger-side air bag is designed to move away from the passenger at the time it deploys, that is, further into the instrument panel.

The following manufacturers still claim an exemption: DaimlerChrysler (MY 90–92 & 95–98), Nissan (MY 95–98), Volkswagen–Audi (MY 95–98), and Volvo (MY 90–92 & 95–98).

3. **A.2.a—Primary initial gas flow vector, measured in degrees from a horizontal plane.**

The primary initial gas flow vector is the angle at which the gas initially begins to flow into the air bag during deployment of the air bag.

The following manufacturers still claim an exemption: DaimlerChrysler, General Motors, Mercedes–Benz, Toyota, Volkswagen–Audi, and Volvo.

4. **A.2.b—For passenger air bags, primary initial direction of deployment.**

This item refers to the initial direction of the air bag when it deploys.

Zinke for Plaintiff and William A. Boehly for NHTSA.

The following manufacturers still claim an exemption: DaimlerChrysler, General Motors, Mercedes–Benz, Toyota, and Volkswagen–Audi.

### B. Air bag Cover

### 5. B.2—Minimum breakout pressure.

This item refers to the minimum pressure needed to cause the air bag cover to tear, thereby causing the air bag to deploy. Variables that must be considered in determining what the minimum breakout pressure should be are the mass of the air bag cover and the tear pattern of the air bag cover, discussed below.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, Mercedes–Benz, Nissan, and Volvo.

### 6. B.3—Mass of cover.

This item refers to the mass of the air bag cover. This variable affects how the air bag deploys; a lighter cover will require less breakout pressure than a heavier one, but a heavier cover might cause injury due to its weight.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Nissan, Toyota, Volkswagen–Audi, and Volvo.

### 7. B.4—Tear pattern of cover (verbal description or illustration).

The tear pattern refers to how the cover of the air bag breaks when the air bag is deployed. The tear pattern can affect the air bag's trajectory and the speed of deployment.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Nissan, Toyota, Volkswagen–Audi, and Volvo.

### C. Air bag System Components

### 8. C.1.b—Fold pattern (verbal description or illustration).

The fold pattern refers to how the air bag is folded and stored in the module.

The fold pattern of an air bag is determined by taking into account the characteristics of a specific type of air bag, as well as the internal dimensions of the vehicle.

All manufacturers still claim an exemption.

### 9. C.1.c—Material of bag and mass of that material.

This item refers to the material of which the air bag is composed and the weight of that material. Virtually all air bags are made of nylon or polyester. The mass and material of the air bag are important to insuring that the air bag does not rip during deployment, but also that it is not so heavy as to injure the occupant by its mass. The material of the air bag affects the venting of the air bag during the collapse of the bag; the material can also cause injury itself, such as abrasions during deployment.

The following manufacturers still claim an exemption: DaimlerChrysler, General Motors, Honda, Nissan, Toyota, Volkswagen–Audi, and Volvo.

### 10. C.1.d—Inflation time, from initiation to full inflation.

This item refers to the time it takes for the air bag to fully inflate. A fast inflation time is important to getting the air bag in position to perform its function. However, a slower inflation time may be more beneficial in protecting occupants who are out of position (i.e., not wearing seatbelts, etc.).

All manufacturers still claim an exemption.

### 11. C.1.e—Volume of fully inflated air bag.

This item refers to the volume of the air bag after it is fully inflated after deployment. It is the fully-inflated air bag that performs the injury-restraint function.

The following manufacturers still claim an exemption: DaimlerChrysler, General Motors, Honda, Mercedes–Benz, Nissan, Toyota, Volkswagen–Audi, and Volvo.

### 12. C.1.f—Number and location of tethers.

The tethers are typically pieces of fabric sewn inside the air bag that control its shape and deployment characteristics. Their function is to control the movement of the air bag and reduce air bag related injuries, such as abrasions caused by the force of deployment. However, in high speed crashes, a tethered air bag may be less effective than an untethered air bag because it does not move as close to the occupant. The decision to include tethers, including their number and location, involves a balance between these two (and other) objectives—reducing air bag related injuries, and protecting occupants in high speed crashes.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Honda, Nissan, Toyota, Volkswagen–Audi, and Volvo.

### 13. C.1.g.(1)—Driver air bag deployment distance: distance between Planes J and K.

This item asks for the distance that the driver-side air bag deploys *rearward*. A longer distance can protect the driver from injuries resulting from contact with the automobile interior, but can also create injury risks to out-of-position drivers.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Honda, Nissan, Toyota, Volkswagen–Audi, and Volvo.

### 14. C.1.g.(2)—Driver air bag deployment distance: distance between Planes F and K, and state which is forward of the other.

This item asks for the distance between the rear-most point that the driver-side air bag reaches when deployed, and the "seat-ing reference point," as defined in 49 C.F.R. § 571.3.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Honda, Nissan, Toyota, Volkswagen–Audi, and Volvo.

### 15. C.1.g.(3)—Driver air bag deployment distance: maximum distance the air bag reaches, laterally on each side of Plane M, at any time during deployment.

This item asks for the distance that the driver-side air bag deploys *laterally*.

All manufacturers still claim an exemption.

### 16. C.1.h.(1)—Passenger air bag deployment distance: for top-mounted air bags, distance between Planes C and L.

This item asks for the distance that a top-mounted passenger-side air bag deploys *rearward*. (See item 13, *supra*.)

All manufacturers still claim an exemption.

### 17. C.1.h.(2)—Passenger air bag deployment distance: for non-top-mounted air bags, distance between Planes D and L.

This item asks for the distance that a passenger-side air bag that is not top-mounted deploys *rearward*.

All manufacturers still claim an exemption.

### 18. C.1.h.(3)—Passenger air bag deployment distance: for all passenger air bags, distance between Planes G and L, and indicate which plane is forward of the other.

This item asks for the distance between the rear-most point that the passenger-side air bag reaches when deployed, and the "seating reference point," as defined in 49 C.F.R. § 571.3.

All manufacturers still claim an exemption.

**19. C.1.h.(4)—Passenger air bag deployment distance: for all passenger air bags, maximum distance air bag reaches laterally on each side of Plane N at any time during deployment.**

This item asks for the distance that the passenger-side air bag deploys *laterally*.

All manufacturers still claim an exemption.

**20. C.2.a—State (yes or no) whether inflator is pyrotechnic, compressed gas, or hybrid, and specify gas generant.**

This item asks what type of inflator is used, and for the type of gas used in the inflator to inflate the air bag. The inflator is the device that fires at a pre-determined point to cause the air bag to deploy and inflate. Until the mid–1990's most manufacturers used a pyrotechnic inflator with sodium azide as the gas generant. Some inflators now use compressed gas or some hybrid of compressed gas and a pyrotechnic. The type of inflator and gas generant are important factors in creating sufficient force for the air bag to break out of its module and deploy. They are also crucial in ensuring that too much force is not expended, creating risks for air bag related injuries.

The following manufacturers still claim an exemption: DaimlerChrysler, General Motors, Honda, Mercedes–Benz (MY 97–98), Toyota, and Volkswagen–Audi.

**21. C.2.b—Number of inflation stages.**

Air bag inflators may be single or multi(usually dual) staged. Through 1998, most inflators were single staged. Multistaging typically involves a time delay between the stages of inflation, in order to control deployment aggressivity. Multistaging may also be used as part of a system strategy in which the initiation and timing of various inflation stages is dependent upon collision severity, belt usage, or other factors.

The following manufacturers still claim an exemption, but only as to passenger air bags for MY 90–92: DaimlerChrysler, Ford, Honda, Volkswagen–Audi, and Volvo.

**22. C.2.c.(1)—Inflator characteristics during a tank test to measure inflator performance: tank volume.**

A tank test is the primary method by which the output from the inflator is characterized. It involves placing an inflator (along with a pressure probe and sometimes a temperature probe) inside a sealed tank, firing the inflator inside the tank, and monitoring the pressure inside the tank. This item asks for the tank volume.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Nissan, Toyota, Volkswagen–Audi, and Volvo.

**23. C.2.c.(2)—Inflator characteristics during a tank test to measure inflator performance: initial absolute pressure in tank (pre-firing).**

This item asks for the pressure in the tank, during a tank test, before the inflator is fired.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Nissan, Toyota, Volkswagen–Audi, and Volvo.

**24. C.2.c.(3)—Inflator characteristics during a tank test to measure inflator performance: temperature (pre-firing).**

This item asks for the temperature in the tank, during a tank test, before the inflator is fired.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Nissan, Toyota, Volkswagen–Audi, and Volvo.

25. **C.2.c.(4)—Inflator characteristics during a tank test to measure inflator performance: tank pressure vs. time.**

This item asks for information regarding how the pressure in the tank varies over time during a tank test of an inflator. This is usually presented in graph form, with pressure plotted as a function of time.

All manufacturers still claim an exemption.

## D. Seatbelts

26. **D.1—Stiffness of seatbelts, i.e., force/elongation characteristics.**

The force/elongation characteristics are a measure of how much a seatbelt stretches for a given unit length of belt material and for a given force.

The following manufacturers still claim an exemption: DaimlerChrysler, General Motors, Mercedes–Benz, Nissan, Toyota, Volkswagen–Audi, and Volvo.

27. **D.2—Load limiting force level.**

Load limiters are devices which are designed to limit the tension in a seatbelt when it rises to certain levels by allowing elongation of the seatbelt. The load limiter often consists of stitches in a loop of webbing that pull out or break when the tension rises to a certain level. The load limiting force characteristics determine how much yielding will take place for a given level of belt webbing tension.

The following manufacturers still claim an exemption: DaimlerChrysler, General Motors, Mercedes–Benz, Nissan, Toyota, Volkswagen–Audi, and Volvo.

## E. Crash Sensors

28. **E.3—Name and address of supplier of the sensors.**

This item requests the name and address of the supplier of the various crash sensors, including weight sensor, buckle sensor, child seat sensor, seat position sensor, on/off switch, inflatable knee bolster, and pre-crash sensor. There are relatively few suppliers of such sensors.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Honda, and Volkswagen–Audi.

29. **E.4—Name and address of supplier of the algorithm.**

This item requests the name and address of the supplier of the algorithm (i.e., that determines when an air bag is deployed).

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Honda, and Volkswagen–Audi.

30. **E.5—State engineering specifications provided to suppliers for development of the algorithm. Define crash conditions and time-to-fire requirements used to develop algorithm, including the following for each crash condition: nominal deployment threshold, no-fire point, and all-fire point.**

The algorithm is the set of logical steps that the microprocessor of an electronic crash sensor goes through to determine whether or not the air bag should deploy. The manufacturers must provide the supplier with performance parameters to develop the algorithm (i.e., air bag should deploy at X m. p.h., but not at Y m.p.h.). The engineering specifications themselves can reveal a manufacturer's design decisions and judgments about air bag deployment. This item asks for the performance parameters used to develop the algorithm:

the crash conditions that were used to define the parameters (rigid barrier impact collision, off-set barrier impact collision, etc.); the amount of time between the crash and the time the sensor module sends the signal to deploy the air bag ("time-to-fire"); the barrier impact speed above which the air bag should always deploy ("all-fire point"); the barrier impact speed below which the air bag should never deploy ("no-fire point"), etc. The algorithm cannot be determined simply from knowing the performance parameters.

All manufacturers still claim an exemption.

## F. System Performance

31. **G.1.c—Test speeds, and head, neck, chest, and femur responses for all belted or unbelted rigid barrier crash tests conducted under test procedures substantially similar to those of Standard 208.**

This item asks for the test speeds and results of crash tests performed by the manufacturers using procedures substantially similar to those designed by NHTSA, referred to as Standard 208.

The following manufacturers still claim an exemption: DaimlerChrysler, General Motors, Honda, Nissan, and Toyota.

32. **G.2—For each out-of-position dummy test (including ISO tests and pendulum tests), state test conditions and procedures, and provide head, neck, chest, and femur responses.**

This item asks for test conditions, procedures, and results of out-of-position crash-dummy tests performed by the manufacturers.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Honda, and Nissan.

33. **G.3—For each offset crash test, state test conditions and procedures, and provide head, neck, chest, and femur responses.**

This item asks for test conditions, procedures, and results of off-set crash tests performed by the manufacturers.

The following manufacturers still claim an exemption: DaimlerChrysler, Ford, General Motors, Honda, Nissan, and Toyota.

## III. *Legal Framework*

Material can be withheld under Exemption 4 of FOIA in one of three ways: if it is a trade secret, if it is commercial information that is voluntarily provided by a person and not customarily disclosed to the public, or if it is commercial information that is mandatorily provided by a person and disclosure of the information would cause impairment to the Government or substantial competitive harm to the submitter.

### A. Trade Secret

The United States Court of Appeals for this Circuit, in *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1288 (D.C.Cir.1983), adopted a narrow common law definition of the term "trade secret." Under FOIA, the term "trade secret" no longer refers to any information that provides a competitive advantage. Instead, "trade secret" is narrowly defined as "a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *Id.* This definition requires that there be a direct relationship between the trade secret and the productive process. *Id.*

Trade secret protection has been recognized for product manufacturing and design information. *See, e.g., Citizens Comm'n on Human Rights v. FDA*, No.

92–5313, slip op. at 14 (C.D.Cal. May 10, 1993) ("information about how a pioneer drug product is formulated, chemically composed, manufactured, and quality controlled" is protected as trade secret), *aff'd in part & remanded in part on other grounds*, 45 F.3d 1325 (9th Cir.1995); *Pacific Sky Supply, Inc. v. Department of the Air Force*, 1987 WL 25456, at *1 (D.D.C. Nov. 20, 1987) (design drawings of airplane fuel pumps developed by private company and used by Air Force are protected as trade secrets). Trade secret protection has, however, been denied for general information concerning a product formula when release would not reveal the actual formula itself. *See Northwest Coalition for Alternatives to Pesticides v. Browner*, 941 F.Supp. 197, 201–02 (D.D.C.1996) ("common names and Chemical Abstract System (CAS) numbers of the inert ingredients" contained in pesticide formulas are not trade secrets).

## B. Commercial, Confidential Information Provided by a Person

In order to determine whether the information is confidential, the Court must first determine whether the supplying of the information to NHTSA was voluntary or mandatory. The D.C. Circuit Court of Appeals has developed two different tests for determining whether information is confidential under Exemption 4, and the test that applies depends on whether the information was provided voluntarily or mandatorily.

### 1. Voluntary or Mandatory?

The dispute in this case—whether the manufacturers were required to respond to the IR, or whether their responses were purely voluntary—revolves in part around the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501 *et seq.* While NHTSA has broad information-gathering powers, if it seeks to collect information from ten or more persons, it must obtain prior approval from the U.S. Office of Management and Budget ("OMB"). 44 U.S.C.

§ 3502(3)(A)(i); 5 C.F.R. §§ 1320.3 and 1320.5. The regulation states that:

"ten or more persons" refers to the persons to whom a collection of information is addressed by the agency within any 12–month period, and to any independent entities to which the initial addressee may reasonably be expected to transmit the collection of information during that period, including independent State, territorial, tribal or local entities and separately incorporated subsidiaries or affiliates. 5 C.F.R. § 1320.3(c)(4).

The purpose of the PRA is to eliminate unnecessarily burdensome information requests. To provide efficient enforcement of the PRA, Congress decided that any request for information that is subject to the statute but does not comply with it may be ignored without penalty. 44 U.S.C. § 3512(a). Congress further provided that the protections of the PRA "may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto." 44 U.S.C. § 3512(b).

### 2. If Responses Are Voluntary, Is the Information Customarily Disclosed to the Public?

█ If the information was voluntarily submitted to NHTSA, protection from disclosure under Exemption 4 will be granted if the information is not customarily disclosed to the public by the manufacturers.

Through its en banc decision in *Critical Mass Energy Project v. NRC*, 975 F.2d 871 (D.C.Cir.1992) (en banc), the D.C. Circuit Court of Appeals established a clear standard for information voluntarily provided to an agency. Such information is now categorically protected provided it is not customarily disclosed to the public by the submitter. *Id.* at 879. The court also stated that this categorical test for voluntarily submitted information is objective and that the agency invoking it "must meet the burden of proving the provider's custom." *Id.*

This standard allows the submitter to make protected disclosures of the information, provided that such disclosures are not made to the general public. *Id.* at 880. In determining whether the information is customarily disclosed to the public, it is irrelevant how the industry as a whole treats the information. *Id.* at 872, 878–80. The Court may only look to how the particular submitter customarily treats the information. *Id.*

The D.C. Circuit has not specifically defined under what circumstances a record is deemed to not be customarily disclosed to the public. Subsequent cases applying the standard offer some guidance. In one case, evidence was introduced to show the submitter's customary treatment of the information, which included carefully guarding disclosure of the documents "even within the corporate structure," the markings on the documents, and the fact that the company "strenuously, and successfully, opposed their production in discovery in multiple civil cases." *McDonnell Douglas Corp. v. U.S. E.E.O.C.*, 922 F.Supp. 235, 242 (E.D.Mo.1996). In another case, the court noted that the submitter had "provided specific, affirmative evidence that no unrestricted disclosure" had occurred. *Allnet Communication Servs., Inc. v. F.C.C.*, 800 F.Supp. 984, 989 (D.D.C.1992).

### 3. If Responses Are Mandatory, Will Disclosure Result in Impairment to Government or Substantial Competitive Harm?

■ If submitting information in response to NHTSA's IR was mandatory, then in order to receive the protections of Exemption 4, the Intervenor–Defendants and NHTSA must show that disclosure will impair either the Government's future attempts at gathering such information, or their competitive positions in the industry.

Despite establishing a new and separate standard for voluntary submissions in *Critical Mass*, the D.C. Circuit Court elected to continue using its pre-existing test for confidentiality established in *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C.Cir.1974), for mandatory submissions. *See Critical Mass*, 975 F.2d at 880. Under the *National Parks* test, the submitter or agency must show that the material is confidential because it is not customarily disclosed to the public *and* because the disclosure of the material would result in (1) impairment to the Government's ability to obtain necessary information in the future or (2) substantial harm to the competitive position of the person from whom the information was obtained. *National Parks*, 498 F.2d at 767, 770.

#### a. Impairment to Government

The Government can show that its future information-collecting efforts would be hampered by disclosure by showing that the information is not customarily disclosed to the public, was provided voluntarily, and the submitting entities would not provide such information in the future for fear of public disclosure. *See, e.g., Bowen v. FDA*, 925 F.2d 1225, 1228 (9th Cir.1991). While the significance of the impairment prong is probably diminished as a result of *Critical Mass*, the prong is still applied to those situations where providing the information is required, but where disclosure of that information under FOIA would result in a diminution of the reliability or quality of what is submitted. *Critical Mass*, 975 F.2d at 878 (citing *Washington Post Co. v. HHS*, 690 F.2d 252 (D.C.Cir.1982)).

#### b. Substantial Harm to Competitive Position

To show substantial harm to their competitive positions, the manufacturers needn't show actual competitive harm, but only the existence of (1) actual competition, and (2) a likelihood of substantial competitive injury. *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1152 (D.C.Cir.1987). No competitive harm can result if the information is publicly available through other sources. *Id.* at 1154 ("To the extent that any data requested under FOIA are in the

public domain, the submitter is unable to make any claim to confidentiality—a sine qua non of Exemption 4."). The requester of the information bears the initial burden of producing evidence to show that the information is available through public sources, but the burden of persuasion remains with the party opposing disclosure. *Northwest Coalition for Alternatives to Pesticides v. Browner,* 941 F.Supp. 197, 202 (D.D.C.1996) (citing *Occidental Petroleum Corp. v. SEC,* 873 F.2d 325, 342 (D.C.Cir.1989)).

One inquiry that must be made in determining whether the information is in the public domain is the feasibility of reverse engineering. In *Worthington Compressors, Inc. v. Costle,* 662 F.2d 45, 52 (D.C.Cir.1981), the D.C. Circuit held that the cost of reverse engineering is a pertinent inquiry and that the test should be "whether release of the requested information, given its commercial value to competitors and the cost of acquiring it through other means, will cause substantial competitive harm to the business that submitted it."

Some courts have found competitive harm and protected information that would not, in and of itself, cause harm, if the information, when combined with other readily available information, could cause harm to the submitter. *See, e.g., Trans–Pacific Policing Agreement v. U.S. Customs Serv.,* 177 F.3d 1022 (D.C.Cir.1999) (Harmonized Tariff Numbers, which are themselves publicly released, protected when linked to specific shipments of goods because "knowledgeable person can use [such] numbers to uncover information concerning the nature, cost, profit margin, and origin of shipments"); *Lederle Lab. v. HHS,* No. 88–0249, slip op. at 22–23 (D.D.C. July 14, 1988) (scientific tests and identities of agency reviewers withheld because disclosure would permit requester to "indirectly obtain that which is directly exempted from disclosure"); *Timken Co. v. U.S. Customs Serv.,* 491 F.Supp. 557, 559 (D.D.C.1980) (data reflecting sales between parent company and subsidiary withheld because even if disclosure of such data "would be insufficient, standing by itself, to allow computation of the cost of production, this cost would be ascertainable when coupled with other information").

## IV. *Analysis*

Prior to determining whether the manufacturers must disclose any of the information Plaintiff seeks, it is necessary to rule on Plaintiff's Motion to Strike. Some of the information Plaintiff seeks to strike is essential to determining whether Exemption 4 applies.

### A. Plaintiff's Motion to Strike

Plaintiff moves to strike several portions of the declarations submitted by NHTSA and the Intervenor–Defendants, arguing that they are based on information that the declarants are not competent to testify to, is not within the personal knowledge of the declarants, or would be inadmissable evidence, in violation of Fed.R.Civ.P. 56(e).

"A declarant in a FOIA case satisfies Rule 56(e)'s personal knowledge requirement when in his declaration, he attests to his personal knowledge of the procedures used in handling a FOIA request and his familiarity with the documents in question." *Hall v. U.S. Dep't of Justice,* 63 F.Supp.2d 14, 16 n. 1 (D.D.C.1999) (internal citations and quotations omitted). Personal knowledge may be inferred from the affidavit itself, by considering the affiant's position and job responsibilities. *Rockport Co., Inc. v. Deer Stags, Inc.,* 65 F.Supp.2d 189, 192 (S.D.N.Y.1999); *see also Government Guar. Fund of Republic of Finland v. Hyatt Corp.,* 960 F.Supp. 931, 943 n. 14 (D.V.I.1997) ("A corporate representative speaks from personal knowledge about information which is generally within the purview of his job."); *Human Resources Institute of Norfolk, Inc. v. Blue Cross of Va.,* 484 F.Supp. 520, 525–26 (E.D.Va.1980) ("the affiants' supplementary affidavits affirming their personal knowledge of the

facts stated in their initial affidavits, coupled with the organization information detailed therein concerning their official duties in the corporation, constitute a sufficient showing of the affiants' personal knowledge of the facts referred to in their affidavits."). Additionally, any "[s]tatements of ultimate fact and conclusions of law will be regarded simply as declarations of each affiant's understanding of the veracity of [the opposing party's] allegations, to the best of [the affiant's] knowledge." *Id.* at 526.

Applying these standards, the Court concludes that in this case, the declarations submitted by the manufacturers are based on the declarants' personal knowledge and are therefore admissible. Declarants, virtually all of whom are engineers, testify to their positions within their companies, stating their duties in the safety and regulatory compliance departments of the respective manufacturers. Given that all declarants have handled or produced the documents that were ultimately sent to NHTSA, as well as their positions and job responsibilities, it is appropriate to infer that the declarants have personal knowledge of that to which they attest. Furthermore, many of the declarants submitted supplemental declarations, affirming that their original declarations were based on personal knowledge. Consequently, Plaintiff's Motion to Strike will be denied with respect to the declarations of the manufacturers.

Plaintiff also moves to strike the declarations submitted by NHTSA and the suppliers. Plaintiff argues that the NHTSA declarations contain legal arguments and conclusions that are the province of the Court, and that the suppliers are in no position to testify to the customary treatment of their documents, since they admit they do not know exactly which of their documents were ultimately sent to NHTSA by the manufacturers. While both these arguments have considerable merit, they do not compel striking the declarations. Obviously the Court will reach its own legal conclusions, and therefore the NHTSA declarations can be given limited weight. As to the suppliers' declarations, the Court will regard them simply as explanations of their understanding of the issues of the case. *See Human Resources*, 484 F.Supp. at 526. In short, Plaintiff's arguments have great merit as to the declarations of NHTSA and the suppliers, but go to the weight the Court should give them, rather than the total striking of them. Consequently, Plaintiff's Motion to Strike will be denied as to these declarations as well.

One additional ground exists for denying Plaintiff's motion. Plaintiff failed to comply with Local Rule 7.1(m) (duty to confer with opposing counsel on non-dispositive motions). Although Plaintiff argues that it did not need to comply because its motion to strike is related to its motion for summary judgment, the latter being a dispositive motion, it is clear that a separate motion to strike is not a dispositive motion. Further, had Plaintiff bothered to comply with the rule in the first place, it may have saved substantial time for the Court and the parties, especially given the volume of the materials submitted and the fact that this matter is being handled on an expedited basis per Plaintiff's request.

For all these reasons, Plaintiff's Motion to Strike is denied.

## B. Application of Exemption 4

FOIA reflects "a general philosophy of full agency disclosure," *Department of Air Force v. Rose*, 425 U.S. 352, 360–361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), in order "to facilitate public access to Government documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991) (citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989)). "[D]isclosure, not secrecy, is the dominant objective" of FOIA. *Id.* at 361, 96 S.Ct. 1592. The Act "requires agencies to com-

ply with requests to make their records available to the public, unless the requested records fall within one or more of nine categories of exempt material." *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C.Cir.1996) (citing 5 U.S.C. § 552(a), (b)).

■ In FOIA cases, the Court may grant summary judgment on the basis of affidavits or declarations that explain why requested information falls within a claimed exemption, as long as the affidavits or declarations are sufficiently detailed, non-conclusory, and submitted in good faith, and as long as a plaintiff has no significant basis for questioning their reliability. *Goland v. CIA*, 607 F.2d 339, 352 (D.C.Cir.1978); *see also Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 861 (D.C.Cir.1980).

A determination of whether any of the information Plaintiff seeks is protected by Exemption 4 requires several steps. The first step is to determine whether any of the information is a trade secret; if so, it is categorically protected by Exemption 4.

If the information is not a trade secret, it must next be determined whether the information is commercial information obtained by a person, and if so, whether submitting it to NHTSA was voluntary or mandatory. If the information is commercial in nature, obtained by a person, and voluntarily submitted, the information is protected by Exemption 4 if it is not customarily disclosed to the public. If the information is commercial in nature, obtained by a person, required to be submitted, not customarily disclosed to the public, and its disclosure will either impair the Government's efforts to obtain similar in-

formation in the future, or cause substantial harm to the submitter's competitive position, then it is protected by Exemption 4. In all cases, however, if the information is publicly available, it is not protected by Exemption 4. *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C.Cir.1987).[3]

### 1. Trade Secret

In *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1286–87 (D.C.Cir.1983), the D.C. Circuit ruled that the broad definition of "trade secrets" presented in the Restatement of Torts, while widely accepted, was inappropriately broad to be applied in FOIA cases. The court held that a more restrictive definition of "trade secret" was necessary in FOIA cases, one that encompasses only the productive process itself, rather than collateral business matters, which would properly fall under the "commercial information" prong of Exemption 4. *Id.* The court went on to adopt the following definition for "trade secrets" in FOIA cases: "a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *Id.* at 1288.

Plaintiff argues that the trade secret exception does not apply to any of the information at issue. It argues that NHTSA did not request any information regarding how air bags are manufactured, but simply asked for information regarding the physical and performance characteristics of the air bags. Consequently, according to Plaintiff, the information at issue is not a "plan, formula, process, or

---

**3.** With respect to the segregability of the information, the manufacturers maintain that none of the information should be released, even in isolation, because the information is an "integrated whole." They argue that release of parts of the information might allow a competitor to determine the technology used in the air bags or the company's "design philosophy," especially in light of information that is readily available. Furthermore, the three supplier Intervenor–Defendants argue that they would suffer a unique and particularly devastating injury if any of this information is released, because their entire business consists of manufacturing air bags. Because the Court is ruling that the information was voluntarily provided, *infra*, the competitive harm prong is not reached, and these arguments need not be addressed.

device" used in the manufacturing of air bags, and thus cannot be protected under the trade secret prong of Exemption 4.

Intervenor–Defendants claim that 28 of the 33 items of information are protected as trade secrets, specifically: whether the air bag is designed to move away from the occupant at the time of deployment, and if so, how far (A.1.a.(3) and A.1.b.(4)); the primary initial gas flow vector (A.2.a); the initial direction of deployment (A.2.b); the minimum breakout pressure (B.2); the mass of the cover (B.3); the tear pattern of the cover (B.4); the fold pattern of the air bag (C.1.b); the mass and material of the air bag (C.1.c); the inflation time (C.1.d); the volume of a fully inflated air bag (C.1.e); the number and location of tethers (C.1.f); the deployment distance of the driver and passenger side air bags (C.1.g.(1), C.1.g.(2), C.1.g.(3), C.1.h.(1), C.1.h.(2), C.1.h.(3), and C.1.h.(4)); the type of inflator and gas generant of the inflator (C.2.a); the number of inflation stages (C.2.b); and the tank test results (C.2.c.(1), C.2.c.(2), C.2.c.(3), and C.2.c.(4)); the stiffness of the seat belt (D.1); the force of load limiters (D.2); and the engineering specifications provided to suppliers for creation of the algorithm (E.5).[4]

■ The restrictive definition of "trade secrets" does not cover physical or performance characteristics of air bags, since they are not secret, commercially valuable plans, formulas, processes, or devices used in making, preparing, compounding, or processing air bags. Furthermore, these characteristics are not directly related to the production process. Consequently, 18 of the 28 items Intervenor–Defendants seek to protect under the "trade secret" prong of Exemption 4 do not qualify, be-

cause they do not fall into the restrictive definition of "trade secret."[5]

### a. Individual Items Protected as Trade Secrets

Several of the items Intervenor–Defendants seek to protect are trade secrets. The tear pattern of the air bag (B.4) is deemed a trade secret because it affects the air bag trajectory and deployment, and therefore represents an important step in preparing the air bag. Consequently, it is a secret, commercially valuable design used for preparing air bags, that is the product of innovation and substantial effort.

The fold pattern of the air bag (C.1.b) is deemed a trade secret. The fold pattern of a particular air bag must be matched with the specific interior design of the car, as well as the company's injury-restraint objectives, to achieve maximum protection of the occupants. Consequently, it is a secret, commercially valuable design used for preparing air bags, that is the product of innovation and substantial effort.

The number and location of the tethers (C.1.f) are deemed trade secrets. The function of the tethers is to control the movement of the air bag, and reduce air bag related injuries. The decision to include tethers, including their number and location, involves a balance between the objectives of reducing air bag related injuries caused by the deployment of the air bag, and protecting occupants from different types of crash-related injuries. Consequently, the number and location of the tethers is a secret, commercially valuable plan used in making and preparing air bags, that is the product of innovation and substantial effort.

---

4. In addition, the suppliers (TRW, Bosch, and Takata) claim that some of the information they supplied to the manufacturers to aid them in responding to the IR is proprietary information. They do not, however, identify any document that Plaintiff seeks that contains any of their proprietary information.

5. Very little case law exists which interprets and applies the D.C. Circuit's definition of "trade secret." The case law is clear, however, that the trade secret must be directly related to the production process to receive "trade secret" protection. *Public Citizen*, 704 F.2d at 1288.

The type of inflator and gas generant used (C.2.a) are deemed trade secrets. Decisions regarding the type of inflator and gas generant used affect how much force will be expended as the air bag breaks out of its module and deploys. A balance must be struck between using too much force (and creating risks for air bag related injuries), or too little force (and risking the possibility that the air bag may not break out and deploy). Consequently, the type of inflator and gas generant used are essential components of a secret, commercially valuable plan used in making and preparing air bags and inflators, that is the product of innovation and substantial effort.

The number of inflation stages (C.2.b) is deemed a trade secret. The number of stages it takes for an air bag to inflate can control how aggressively the air bag deploys. Multiple stages can also be used as part of a system strategy in which the initiation and timing of various inflation stages is dependent upon collision severity, belt usage, or other factors. Consequently, the number of inflation stages is an essential component of a secret, commercially valuable design used in making and preparing air bags and inflators, that is the product of innovation and substantial effort.

The various tank tests used to measure inflator characteristics (C.2.c.(1), C.2.c.(2), C.2.c.(3), and C.2.c.(4)) are deemed trade secrets. These tests demonstrate inflator output as a measure of pressure over time, and together can reveal basic inflator designs. Consequently, these tank test are secret, commercially valuable plans used in making and preparing inflators, that are the product of innovation and substantial effort.

The engineering specifications provided to the suppliers for development of the algorithm (E.5) are deemed trade secrets. The engineering specifications themselves

can reveal a manufacturer's design decisions and judgments about air bag deployment. Consequently, the specifications are secret, commercially valuable formulas used in making and preparing air bags, that are the product of innovation and substantial effort.

Plaintiff argues that most of these items are not trade secrets because the manufacturers have publicly disclosed them by putting their vehicles on the market. Plaintiff argues that at least the physical characteristics of the air bags are easily discernible to the public and to a manufacturer's competitors by using simple hand tools to dismantle the air bags. However, Plaintiff is simply wrong that the mere placement of a vehicle on the market is equivalent to revealing the physical characteristics of air bags. Dismantling air bags to learn this information is dangerous,[6] time-consuming, and expensive. The air bags, and therefore their physical characteristics, are not in public view, and cannot be found simply by looking inside a car or even disassembling the steering column and dashboard. Plaintiff's argument is similar to stating that the maker of a computer microchip, by putting the computer on the market, has therefore disclosed the microchip's configuration because any person can open up the computer and examine the microchip.

## 2. Commercial, Confidential Information Obtained from a Person

█ The parties do not dispute that all of the information is information obtained from a "person" (as defined in the statute). Plaintiff argues that some of the information has no commercial value because it is either stale (i.e., it is old information that is no longer used in air bag technology), or consists merely of test results, which have no commercial value. Plaintiff also argues that the information is not commercially

---

**6.** Because of the explosive force of a deploying air bag, serious injury could result if it is

not dismantled with skill and care.

valuable because competitors can easily reverse engineer most if not all of this information, since they are already equipped to do so and the only additional cost is that of technical labor.

Information does not become stale merely because it is old. The information in this case represents years of research and development and enormous financial investment that went into developing the air bag systems used in today's cars. Intervenor–Defendants maintain that some of the information is still used today, and even if it is not, disclosing it would provide insights into a manufacturer's "design concept and philosophy." Such insights would allow a competitor to determine the direction of the company's past and current efforts in research and development (and thus beat them to new advancements), and would give competitors an edge in improving their own technology by not having to invest as much time and money in research and development (or waste time and money on trial-and-error methods).

Defendants also argue that even the test results are commercially valuable, because they are internal efforts to ascertain the performance and efficacy of their systems, and disclosure would give competitors information about how their air bag systems are performing. In fact, the data submitted to NHTSA presents a comprehensive picture of the progression of air bag technology over almost a decade. Reverse engineering is very expensive, and would not give competitors the detailed, compiled information that exists in the Intervenor–Defendants' responses to the IR. Consequently, the information is commercially valuable, and the only dispute is whether this information is confidential. The test to apply in determining whether the information is confidential depends on whether the information was voluntarily or mandatorily provided to NHTSA.

## a. Was the Information Provided to NHTSA Voluntary or Mandatorily?

Although the D.C. Circuit, in *Critical Mass*, established that a separate test mush be applied for information voluntarily provided, it offered no guidance in determining what constituted such voluntariness. Very few subsequent cases exist which offer much guidance. In *Lykes Bros. Steamship Co. v. Pena*, 1993 WL 786964, *4, *8 n. 4 (D.D.C. Sept. 2, 1993), the court ruled that a submission can be mandatory if it is a "condition necessary to receiving approval of [an] application" made to the Government, or if submissions are required "to realize the benefits of a voluntary program ..." For example, submissions necessary for obtaining approval for a drug from the Food and Drug Administration are considered mandatory. *Public Citizen Health Research Group v. FDA*, 964 F.Supp. 413, 414 n. 1 (D.D.C. 1997). While agency authority to require submissions is one factor that must be considered, the mere existence of such authority does not necessarily render such a submission mandatory. *See McDonnell Douglas Corp. v. U.S. E.E.O.C.*, 922 F.Supp. 235, 242 (E.D.Mo.1996) (holding that existence of subpoena did not make EEOC's document request mandatory: "[i]t is simply not correct that *everything* the EEOC might ask for qualifies as 'required' under the *Critical Mass* test.") (emphasis in original).

Several factors in the instant case lead to the conclusion that the responses submitted to NHTSA were submitted voluntarily.[7] The responses were submitted to allow NHTSA to formulate its proposed rule on air bags. Consequently, the information was intended to aid NHTSA in developing a substantive policy position, and was not part of any NHTSA proceeding, investigation, or compliance reporting where the submitter faced any risk of pen-

---

7. Two of the Intervenor–Defendants, Daimler-Chrysler and Mercedes–Benz, noted in their submissions to NHTSA that their responses were voluntary. This has no effect here for the reasons stated below.

alties or sanctions. Furthermore, the information was not a condition precedent to gaining approval of some application, or receiving a government benefit.

A final factor to consider in this analysis is whether NHTSA could have required the manufacturers to submit responses, had they chosen to ignore the IR rather than responding to it as they did. It is clear that NHTSA has broad information-gathering powers, but its ability to enforce those powers depends in part on the Paperwork Reduction Act ("PRA"). The PRA requires an agency seeking to gather information from ten or more persons to get pre-clearance for that information request from the Office of Management and Budget ("OMB"). 44 U.S.C. § 3502(3)(A)(i); 5 C.F.R. §§ 1320.3 and 1320.5. The applicable regulation defines "ten or more persons" to include not only those to whom the information request is sent, but also "any independent entities to which the initial addressee may reasonably be expected to transmit the collection of information during that period." 5 C.F.R. § 1320.3(c)(4).

It is clear in this case that the nine original addressees would have had to transmit the information to several independent entities: Volkswagen of America, being only an importer, had to submit the IR to Volkswagen AG and Audi AG, and all nine manufacturers had to collect information from their suppliers. Consequently, NHTSA violated the PRA in sending the information request to the manufacturers without obtaining pre-clearance from OMB, and thus could not have required the Intervenor–Defendants to submit responses had they chosen to ignore the IR.

Plaintiff argues that the PRA does not apply to this case for two reasons. First, Plaintiff argues that objections regarding the PRA should have been made at the time the responses were due to NHTSA, and therefore the manufacturers have waived their objections by not raising

them earlier. Second, Plaintiff argues that this litigation is a collateral proceeding, and the protections of the PRA do not extend to it, nor do they alter the application of Exemption 4.

Plaintiff is correct in both respects. The protections of the PRA extend only to "the agency administrative process or judicial action applicable thereto." 44 U.S.C. § 3512(b). This is not such a proceeding, as this FOIA lawsuit does not concern the "agency administrative process" for which the IR was issued, but rather disclosure of the information submitted in response to the IR.[8] Consequently, the manufacturers' PRA protections do not extend to this litigation.

The fact that the PRA protections are not available to Intervenor–Defendants does not, however, answer the question of whether it was mandatory for the manufacturers to provide the information. The crux of the issue is whether NHTSA could have forced the manufacturers to respond to the IR had they chosen not to do so. The answer is unequivocally "no," because NHTSA violated the PRA by failing to obtain pre-clearance from OMB prior to sending out the IR. 44 U.S.C. § 3502(3)(A)(i); 5 C.F.R. §§ 1320.3 and 1320.5. The manufacturers' responses to the IR were, therefore, voluntary, whether or not they chose to make the PRA objections at the time they submitted those responses. Consequently, for all these reasons, the Intervenor–Defendants' submissions were voluntary, and the *Critical Mass* test must be employed to determine whether the information is confidential.

**b. Is the Information Customarily Disclosed to the Public?**

The information submitted to NHTSA is totally protected under Exemption 4 if the Intervenor–Defendants can show that they do not customarily disclose such information to the public. *Critical Mass,* 975 F.2d at 879. Limited disclosures, such as to

---

**8.** An example of a "judicial action applicable thereto" would be a judicial proceeding to require a manufacturer to submit a response to the IR.

suppliers or employees, do not preclude protection under Exemption 4, as long as those disclosures are not made to the general public. *Id.* at 880. The Court must look at each manufacturer's customary treatment of this information, rather than how the industry as a whole treats it. *Id.* at 872, 878–80.

The declarations of the Intervenor–Defendants demonstrate that they do not customarily disclose the information to the public. All declarants have worked for their respective employers for significant periods of time, and are knowledgeable about their companies' air bag systems and designs. All have stated that they are familiar with the information sent to NHTSA, and that it is not information that is customarily disclosed to the public. The declarants state that this information is disclosed only to employees or other entities as necessary, but always accompanied by a confidentiality agreement or protective order.

Plaintiff makes two arguments with respect to the confidentiality of the information at issue. Plaintiff first claims that much of this information is publicly available simply because the manufacturer has placed the vehicle on the market. The Court has already addressed this argument.

Plaintiff's second argument is that the manufacturers have revealed this information in other sources, such as service manuals, specifications sent to suppliers for bids, in litigation, in publicly-available crash test films, in prior voluntary submissions to NHTSA, and in press releases, annual reports, and other such disclosures to the general public. Plaintiff also produced evidence that information on slightly less than half of the items still in question has been publicly disclosed by the manufacturers, a fact which they argue seriously undermines the accuracy of the manufacturers' declarations.

However, in each instance, the disclosures which Plaintiff was able to uncover do not indicate *customary* disclosure, but only discrete disclosures to persons or agencies who require the information. Such disclosures have been limited, and have generally been accompanied by confidentiality agreements or protective orders. Furthermore, the minimal information released to the public is very general in nature and, only an approximation of the information supplied to NHTSA. The comprehensive and detailed compilations of information provided to NHTSA are not in the public domain. Plaintiff has furthermore been unable to produce any evidence of public disclosure as to more than half of the remaining items in question.

In addition, Plaintiff has been unable to prove that the information it has uncovered is identical to the information provided by Intervenor–Defendants. Plaintiff must show that the information is in fact identical. In *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy,* 169 F.3d 16, 19 (D.C.Cir.1999) (citing to *CNA Fin. Corp. v. Donovan,* 830 F.2d 1132, 1154 (D.C.Cir.1987)) (internal citations omitted and emphasis added), the court stated:

> Niagara's position here is a little odd: if the information is publicly available, one wonders, why is it burning up counsel fees to obtain it under FOIA? But the logic of FOIA compels the result: if *identical* information is truly public, then enforcement of an exemption cannot fulfill its purposes. On this issue *the party favoring disclosure has the burden of production,* for otherwise the party opposing disclosure would theoretically have to identify all public sources not reproducing the information.

Because Intervenor–Defendants have shown that they do not customarily disclose the information they provided to NHTSA, and because Plaintiff has failed to prove otherwise, the information not already protected as trade secrets is confidential information, and is thus protected under the second prong of Exemption 4.

## V. Conclusion

This case was brought by Plaintiff under the Freedom of Information Act. Plaintiff seeks information provided to NHTSA in response to an information request regarding the Intervenor–Defendants' air bag systems in all vehicles manufactured in model years 1990–1998. Defendant NHTSA and the Intervenor–Defendants opposed the disclosure of the items in question on the basis that the information was protected under Exemption 4 of the FOIA.

For the reasons discussed above, the following items are protected under Exemption 4 because they are trade secrets: B.4, C.1.b, C.1.f, C.2.a, C.2.b, C.2.c.(1), C.2.c.(2), C.2.c.(3), C.2.c.(4), and E.5. The following items are protected under Exemption 4 because they are commercially valuable confidential information voluntarily provided to NHTSA by a person: A.1.a.(3), A.1.b.(4), A.2.a, A.2.b, B.2, B.3, C.1.c, C.1.d, C.1.e, C.1.g.(1), C.1.g.(2), C.1.g.(3), C.1.h.(1), C.1.h.(2), C.1.h.(3), C.1.h.(4), D.1, D.2, E.3, E.4, G.1.c, G.2, and G.3.

Consequently, Plaintiff's Motion to Strike [# 95] is **denied,** Plaintiff's Motion for Summary Judgment [# 59] is **denied,** and the Defendant's and Intervenor–Defendants' cross-motions for summary judgment [# 74, # 76, # 78, # 80, # 90] are **granted.** An Order will issue with this opinion.