Walter B. FREEMAN,

v.

**BUREAU OF LAND MANAGEMENT, U.S. Department of the Interior, Defendants.**

Civil No. 05–3073–PA.

United States District Court, D. Oregon.

Nov. 20, 2007.

Richard M. Stephens, Groen Stephens & Klinge LLP, Bellevue, WA, for Plaintiff.

Bradley Grenham, U.S. Department of the Interior Office of the Regional Solicitor, Karin J. Immergut, Timothy W. Simmons, U.S. Attorney's Office, Portland, OR, for Defendants.

## OPINION AND ORDER

OWEN M. PANNER, District Judge.

Plaintiff Walter Freeman brings this action against the federal Bureau of Land Management ("BLM") and Department of Interior, to prevent Defendants from disclosing portions of a document pursuant to the Freedom of Information Action ("FOIA"), 5 U.S.C. § 552. Both sides move for "summary judgment." [1]

### Background

Freeman controls 161 mining claims covering 4,968 acres of federal land near Rough and Ready Creek in Josephine County, Oregon. The claims are known as the "Nicore Claims Group." Freeman's family has resided on the mining claims since the 1940's, and Freeman now occupies a residence there. Companies have explored the mineral potential of these lands, but none proceeded with actual mining. Nevertheless, the Freeman family has continued to occupy these federal lands.

In 1992, Freeman applied for a mineral patent for the mining claims. This would give Freeman outright ownership of these

---

**1.** Summary judgment standards and procedures are inapposite to most cases in which agency action is reviewed under the Administrative Procedure Act. The better practice is to utilize appellate briefing procedures. The present case was reassigned to me after briefing was nearly complete.

lands pursuant to the General Mining Law of 1872, 30 U.S.C. § 22. Freeman also submitted a Proposed Plan of Operations for mining laterite deposits. The precise mineral composition of laterite deposits can vary. The Nicore laterite is comprised mostly of silica, magnesia, and iron, but also contains some nickel, chromium, cobalt, aluminum, and other minerals. Of these, nickel is the most important commercially.

In recent times, commercial nickel mining has rarely been undertaken in the United States. According to the BLM, the only large nickel mining facility within the continental United States was at "Nickel Mountain" near Riddle, Oregon. It operated from 1954 to 1998. Today, most nickel ore is extracted from very large mines in places such as Indonesia, New Caledonia, Western Australia, and Columbia.

Freeman's mining proposal was opposed by some environmental groups. A number of Freeman's mining claims are situated in environmentally sensitive locations containing rare plants, important watersheds, and few roads. An Environmental Impact Statement ("EIS") was prepared and circulated. After reviewing the EIS, the Forest Service authorized only the removal of a large ore sample. Even that work had to be done by helicopter, so no additional roads would be constructed.

Freeman subsequently brought a takings action in the United States Court of Federal Claims. *Walter B. Freeman v. United States*, No. 01–39L. The Court of Federal Claims ordered the BLM to determine the validity of Freeman's mining claims. As part of that process, the BLM evaluated the commercial feasibility of Freeman's proposed mining operation. After concluding that the materials Freeman had submitted were inadequate, the BLM commissioned a government-funded study of the project. The findings and conclusions of that study are described in the Nicore Mineral Report, dated January 31, 2005 (the "Mineral Report"). The Mineral Report concluded that Freeman's mining plan contained numerous flaws and was not economically viable. The Mineral Report further concluded that:

> The deposits at Nicore are both small and of low grade and, as such, there exists no scenario under which the project could be economic under the metal price assumptions used in this report. Therefore, based on the validity examination performed by the BLM Examination Team, no discovery, as defined in *Castle v. Womble*, 19 LD 455 (1894), exists on any of the Claimant's 161 mining claims.
>
> It is recommended that the BLM initiate contest proceedings against all 161 mining claims. . . .

Nicore Mineral Report, pp. 1–8 to 1–9.

The Western Mining Action Project, an environmental group, filed a FOIA request with the BLM, seeking disclosure of the Nicore Mineral Report. The BLM permitted Freeman to identify specific provisions of the Mineral Report that Freeman wanted withheld. Several rounds of negotiations between Freeman and the BLM ensued. The BLM State Director agreed to redact portions of the Report, while overruling other of Freeman's objections.

Freeman appealed that decision to the Department of Interior, but the result was not what Freeman had hoped. That agency ruled that the entire Mineral Report should be disclosed. In the present action, Freeman challenges that decision, and asks this court to require that portions of the Report be withheld. The information Freeman seeks to redact includes:

A. **The quantity and quality of the ore reserve.**

1. Tonnage, i.e., the quantity of nickel and other metals the site may contain.

2. Grade, i.e., the concentrations of various metals in the ore.

3. Quantity of ore that would be economically feasible to mine, and how much nickel and other metals could economically be extracted from that ore.

4. Cut-off grade (lowest grade of ore that will meet costs).

5. Thickness of ore deposit and distance to bedrock.

6. Identity of laboratory that analyzed the samples, general description of process used by laboratory, detection limits of the laboratory's equipment, and laboratory's certificate of registration.

7. Discussion of method used to take ore samples, and whether it produces reliable results.

B. **Other details regarding the mining operations.**

1. Proposed rate of mining (tons per year).

2. Estimated project operating lifespan (in years).

3. Details regarding the amount of rock that must be screened or discarded to produce a given quantity of nickel.

4. Moisture content of the laterite ore.

5. Equipment to be used in mining operations.

6. Staffing requirements for the mine.

7. Miles of haul roads.

8. Hours the mine would operate each day, how many days a year it would operate, and how much ore it will produce daily, weekly, and annually.

C. **Details regarding the extraction of metals from the ore.**

1. Proposed method of extracting nickel from laterite.

2. Alternative methods of extraction.

3. Results of tests using various methods of extracting metal from Nicore laterite ore.

4. Amount of slag that will be generated, chemical composition of that slag, and the price Freeman expects to receive per ton of slag.

5. Equipment and facilities that would be needed.

6. Staffing requirements.

7. Estimated electrical power consumed per ton of ore processed.

8. Discussion of other potential heat sources for the furnace.

9. Techniques for enriching ore to increase the nickel content.

D. **Details regarding Freeman's plans to produce and market stainless steel from the mined material.**

1. How much purchased nickel and chromium Freeman must add, to the metal recovered from the Nicore mine, to produce a given quantity of stainless steel.

2. Value of nickel and chromium, in the Nicore laterite, compared to the total value of the resulting stainless steel (as a percentage).

3. Type of stainless steel Freeman proposes to produce.

4. Estimated market price for that steel.

5. Freeman's estimate of capital and operating costs, profit margins, and the cost to produce each ton of nickel or stainless steel.

6. Tax credits Freeman expects to qualify for, which were factored into his cost and profit estimates.

7. Estimated cost for electrical power used in smelting operations.

Defendants have provided the Western Mining Action Project with a redacted version of the Mineral Report containing the materials to which Freeman has not objected.

### Legal Standards

"The Freedom of Information Act sets forth a policy of broad disclosure of Government documents in order to ensure an informed citizenry, vital to the functioning of a democratic society." *FBI v. Abramson,* 456 U.S. 615, 621, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982) (internal punctuation omitted). *See also High County Citizens Alliance v. Clarke,* 2005 WL 2453955 (D.Co.2005) (FOIA's "purpose is to enable the public to scrutinize agency action so that the government can be held accountable for its decisions").

██ "FOIA contains nine exceptions to this presumption of disclosure 'that are to be narrowly construed by the courts.' " *Frazee v. United States Forest Service,* 97 F.3d 367, 370 (9th Cir.1996) (quoting *GC Micro Corp. v. Defense Logistics Agency,* 33 F.3d 1109, 1112 (9th Cir.1994)). "The party seeking to withhold information . . . has the burden of proving that the information is protected from disclosure under FOIA." *Frazee,* 97 F.3d at 371.

██ A "reverse FOIA" action is cognizable only under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Review under the APA is deferential with respect to any factual findings or exercise of agency judgment. The agency's decision must be affirmed unless arbitrary, capricious, an abuse of discretion, made without observance of required procedures, or otherwise contrary to law. 5 U.S.C. § 706(2).

### Discussion

Freeman relies on 5 U.S.C. § 552(b)(4), commonly known as Exemption Four, which exempts from the disclosure requirements of FOIA "trade secrets and commercial or financial information obtained from a person and privileged or confidential."

 Even when FOIA does not compel disclosure of a document, an agency may voluntarily disclose the document absent some other law affirmatively prohibiting disclosure. "By its terms, [§ 552(b)] demarcates the agency's obligation to disclose; it does not foreclose disclosure." *Chrysler Corp. v. Brown,* 441 U.S. 281, 291–92, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). Accordingly, Freeman must do more than simply show that FOIA does not require disclosure. Freeman must also point to some other law prohibiting disclosure of the information at issue.

██ Toward that end, Freeman relies upon the Trade Secrets Act, 18 U.S.C. § 1905. The Ninth Circuit has treated the prohibitions of the Trade Secrets Act and the provisions of Exemption 4 of FOIA as "coextensive." *Frazee,* 97 F.3d at 373; *Pacific Architects and Engineers, Inc. v. United States Department of State,* 906 F.2d 1345, 1347 (9th Cir.1990). Accordingly, materials that are within the scope of Exemption 4 may not be disclosed (assuming no other law requires disclosure).

The Ninth Circuit has construed Exemption Four as preventing "disclosure of (1) trade secrets and commercial or financial information, (2) obtained from a person or by the government, (3) that are privileged or confidential." *Pacific Architects,* 906 F.2d at 1347.

### A. Voluntarily Provided Versus Required

██ As a threshold matter, Freeman argues that much of the information in the Nicore Mineral Report is based on information he voluntarily provided to the government, hence those portions of the Report are exempt from disclosure.

In *Critical Mass Energy Project v. Nuclear Regulatory Commission,* 975 F.2d 871 (D.C.Cir.1992) (en banc), the majority—over a strong dissent—drew a distinction between material voluntarily furnished to the government, versus material a person was required to provide to the government. Reasoning that "persons whose confidences have been betrayed will, in all likelihood, refuse further cooperation," the majority established a laxer standard for withholding voluntarily provided materials. *Id.* at 878–79. By contrast, if a person is required to provide the information, there is little "danger that public disclosure will impair the ability of the Government to obtain this information in the future." *Id.* at 878 (citation omitted).

The Ninth Circuit has not yet decided whether to adopt this voluntary-required dichotomy. *Frazee,* 97 F.3d at 372 (declining to decide question). Nor is it necessary to decide that question here. For purposes of the *Critical Mass* dichotomy, the disputed material was not voluntarily furnished by Freeman.

Freeman did not provide this information to the government for altruistic reasons, as a public spirited citizen, or even in the spirit of cooperation. *Cf. Critical Mass,* 975 F.2d at 878 ("the purpose served by the exemption in such instances is that of 'encouraging cooperation with the Government by persons having information useful to officials'") (citation omitted).

Freeman provided the data in an effort to gain title to over five thousand acres of public land potentially worth millions of dollars. He is suing the United States,

alleging a taking, and has a pending mineral patent application covering these same lands. To prevail on the patent application, Freeman must prove the lands contain a mineral deposit with a value reasonably likely to exceed the costs of extracting, transporting, processing, and marketing the minerals obtained. *See United States v. Coleman,* 390 U.S. 599, 602, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968) ("Minerals which no prudent man will extract because there is no demand for them at a price higher than the costs of extraction and transportation are hardly economically valuable"). The data Freeman provided is nothing more than what the government requires all patent applicants to submit, namely, information supporting his claim that a valuable mineral deposit exists within each location covered by the patent application.

Given the extraordinary benefits Freeman hopes to gain by virtue of his mineral patent application and taking claim, disclosure of the data Freeman provided is unlikely to deter Freeman, or others similarly situated, from providing such data to the government in the future. *Cf. Frazee,* 97 F.3d at 372 (bidders required to submit Plan of operations).[2] Even assuming this Circuit adopted the *Critical Mass* dichotomy, the traditional standard (and not the lesser standard for "voluntarily provided" data) would apply when evaluating whether these documents are subject to withholding under Exemption Four.

### B. *Received from a Person*

 Defendants argue that information which the government has developed

---

**2.** Bureau of Land Management Manual § 1278.32(D)(1)(b)(2)(b) is consistent with this interpretation:

> *Test for Confidentiality of "Voluntary" Information.* Information which is provided *voluntarily* to the Government (above and

beyond what is required, and derives no benefit from the Government for doing so) may be considered confidential only if that information can be proven to be routinely treated by the company as confidential. (Emphasis in original).

itself, such as the agency's own research or conclusions, is not data received from a person, hence Exemption Four is inapplicable. That is true, as a general proposition. The difficulty here is that the government's research and conclusions sometimes are inextricably intertwined with data furnished by Freeman. For example, Freeman provided the government with the precise locations where he gathered ore samples, and the assay results. The government then followed in Freeman's tracks, taking samples from the identical locations—even using the same trenches, whenever possible—and compared the laboratory analysis of the samples it gathered with the results reported by Freeman. With regard to that sampling, the government's research piggybacks upon Freeman's data to such an extent that the government's data is not truly independent for purposes of Exemption Four.

## C. *Trade Secrets*

Freeman has identified two categories of information that he contends qualify as trade secrets under Exemption Four. Defendants disagree.

■■■ For purposes of Exemption Four, the term "trade secret" does not encompass all confidential commercial information of any kind. Rather, it generally has been limited to a "secret, commercially valuable plan, formula, process, or device that is used for the making, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *Public Citizen Health Research Group v. Food and Drug Admin.*, 704 F.2d 1280, 1288–89 (D.C.Cir.1983).

### 1. *Tonnage and Grade of Ore*

■■■ Information such as the tonnage and grade of ore is not a "plan, formula, process, or device." Whether such infor-

mation is exempt from disclosure as confidential commercial information is discussed later in this opinion.

### 2. *The DART Process*

■■■ Freeman proposes to use something he calls the "DART process" to extract metal from the ore and manufacture stainless steel, at a lower cost than traditional processing methods. Or at least, that is what Freeman hopes DART will accomplish.

Defendants concede DART is a manufacturing process for purposes of Exemption Four. However, Defendants argue, DART is not a "commercially valuable" process because it is a "novel concept that has not been tested." Defendants' Opening Brief at 13. In Defendants' opinion, there is no evidence a competitor would want to use the DART process, let alone that a prudent competitor "would cease using its current processing technique to adopt his untested DART process as its own." *Id.* (internal punctuation omitted).

Freeman concedes DART is novel and untested. But, he argues, that "does not mean that it has no value." Freeman contends that Defendants applied the wrong standard, and that—to be protectable as a trade secret—Freeman need not show his competitors would abandon their existing manufacturing processes and adopt Freeman's process instead.

Whether DART will achieve the results claimed by Freeman is uncertain at best. The description of DART in the Mineral Report is rudimentary. Defendants may be correct in assuming that no prudent business person would risk millions of dollars to construct a mine and mill based on this unproven technology—at least not for the volume of ore in question here, and the expected profit margins. This may even be a valid consideration when evaluating the merits of Freeman's mineral patent

application and taking claim. But that is a very different question from whether the agency must disclose the details of Freeman's proposed manufacturing process.

Defendants assume the "trade secrets" language in Exemption Four is inapplicable unless the agency determines that a manufacturing process is, in fact, "commercially valuable." Defendants' reasoning is problematic. It suggests a federal agency must evaluate the commercial viability of a manufacturing process or other alleged trade secret before the agency can decide whether to release documents concerning that process or other secret. I doubt Congress envisioned such a procedure when it enacted FOIA. The agency's evaluation of Freeman's manufacturing process is no substitute for the verdict of the marketplace. One can imagine a bureaucrat at the Department of Commerce, not many years ago, writing, "A search engine for the internet—how could you possibly make money with that idea?"

Defendants also erred by requiring Freeman to prove his competitors would "cease using [their] current processing technique to adopt his untested DART process as [their] own." Under that standard, the secret recipe for Coca–Cola would be unprotectable absent proof that the manufacturers of Pepsi–Cola and Dr. Pepper would abandon their own recipes and adopt the Coca–Cola recipe.

Defendants' analysis would be more defensible if the agency's interpretation were compelled by the plain language of the statute. It is not. The "commercially valuable" language is a judicial gloss crafted by the D.C. Circuit to define the term "trade secrets," which FOIA does not define. *See Public Citizen,* 704 F.2d at 1288.

Limiting "trade secrets" to processes actually proven to be "commercially valuable" may have some justification in an action seeking damages for misappropriation of trade secrets—injury being an essential element of a tort claim—and perhaps even for purposes of 18 U.S.C. § 1905 (making improper disclosure of trade secrets a crime under some circumstances). Importing this requirement into FOIA can be unwieldy, as this case demonstrates.

Freeman can make a sufficient showing, for purposes of Exemption Four, if he establishes that DART is a "secret" manufacturing process that may have commercial value, and which Freeman has treated as such. Defendants set the bar too high, at least for purposes of Exemption Four. The marketplace, not the federal government, will decide whether DART ultimately has any commercial value.

■■■ Defendants' fallback argument, at least in this court, is that DART is not a secret. Rather, Defendants assert, the concept is based on information in publicly available books and papers. Federal Defendants' Reply at 3, and Additional Briefing at 5. Perhaps so. The problem with that argument is the agencies took the opposite position in the decision under review. The Department of Interior not only characterized DART as "novel," but specifically stated that "neither the BLM nor the Department were able to find any literature on the Internet regarding the 'DART' process." "Since the withheld information in the Mineral Report about the 'DART' process is not publicly available, the Department concludes that the process is a 'secret'...." Department of Interior Response to FOIA Appeal No.2006–017, p. 3 (March 27, 2006).

■■■ An agency decision generally must stand or fall on the justifications articulated in the challenged decision, not upon a new justification asserted for the first time in this court. *See Beno v. Shalala,* 30 F.3d 1057, 1073–74 (9th Cir.1994). The government has pled itself into a corner.

 Freeman's objection to disclosure of the DART process is sustained. Defendants shall redact that information. This includes Freeman's descriptions of DART (e.g., pp. 10–21, 12–5 to 12–7), and his list of equipment required for the DART process (p. 12–9). It does not include the cost of building or operating the processing plant. Cost is not a "trade secret," but "commercial information," for purposes of Exemption Four. The limited technical information on pages 14–3 and 15–3 (the line item description titles) need not be redacted either. Comparable details were already disclosed to the public in Chapter 12.

### D. *Confidential Commercial Information*

 To warrant redaction as confidential commercial information under Exemption Four, the information must not previously have been disclosed, and the person seeking to withhold the information must show that disclosure is likely to cause substantial harm to the *competitive* position of the person from whom the information was obtained. *GC Micro Corp.*, 33 F.3d at 1112–13. That the person prefers not to have the information released, for other reasons, is insufficient.

 The "substantial harm" analysis requires more than a theoretical possibility of injury or scintilla of harm. The evidence must establish both (1) actual competition and (2) a likelihood of substantial competitive injury. *Id.* at 1113. Conclusory and generalized allegations of competitive harm are not enough. *Id.*

The extent of Freeman's competition is debatable. The record reveals no major nickel mines presently operating in the United States. There was a mine in Oregon, but it closed in 1998. Freeman argues that there are other nickel laterite deposits in Oregon, Washington and Northern California. Table 5–2 of the Mineral Report lists some such deposits. "All have a relatively small quantity of contained nickel at a grade generally less than 1% Ni." Mineral Report, p. 5–24. Barring improvements in extraction technology, or an extraordinary increase in nickel prices, it seems unlikely those deposits will actually be mined. The environmental review process for a new nickel mine would also be costly and time-consuming.

All significant nickel mines operate outside the United States. The projected output of Freeman's mine is very small relative to the giant overseas mines. The BLM thought it unlikely these mine operators would be concerned with competition by Freeman. That conclusion seems reasonable.

Nickel is traded on world markets such as the London Metal Exchange, where prices, sales volume, and inventories are publicly disclosed. In recent years, demand for nickel—especially from China— has been high. If Freeman can provide a sufficient quantity of nickel, in suitable form, there is no obvious reason why he couldn't find a buyer for it. Whether his revenues would exceed the cost of developing and operating the mine, extracting the metal, and transporting it, is another matter.

Freeman does not propose to sell nickel. Rather, he proposes to use the material he mines, along with large quantities of metals he would purchase, to manufacture a specific type of stainless steel. The BLM has expressed serious doubts about Freeman's ability to consistently produce that product, using the process he described, and to do so at a profit.

#### 1. Quantity and Quality of the Ore Reserve

 Freeman seeks to redact the amount of ore at this location, the concen-

trations of various metals in the ore, and an estimate of how much nickel can be recovered over the life of the mine. Freeman offers no plausible explanation why disclosure of that information would cause him substantial competitive harm.[3]

In some circumstances, a prospector will temporarily seek to conceal information regarding a mineral discovery until the claim is properly staked and recorded, to prevent rivals from claiming the property first. This is not such a circumstance. The mining claims at issue allegedly were staked more than half a century ago. The precise location of each claim is public record. Freeman's intent to construct a nickel mine at this location has been the subject of much public debate.

Freeman asserts it is customary to withhold information regarding nickel mines. The Department of Interior concluded otherwise. In its experience, mining companies routinely release such data, and nickel mines are no exception. Table 5–1 of the Mineral Report prepared for the BLM provides tonnage and mineral composition information regarding all major nickel mines, worldwide, and even for large ore deposits not yet in production. Table 5–2 of the Mineral Report provides assay information on other nickel deposits in the Pacific Northwest. The Mineral Report also reveals information about the former Nickel Mountain mine in Riddle, Oregon, including the volume of ore produced, concentration of nickel, and average moisture content of the ore. *Id.*, p. 5–24, Table 10–1. The Report compares the soil profiles of Freeman's claims with that of Nickel Mountain. *Id.*, p. 6–19. All of the foregoing was obtained by BLM from publicly available information, and these portions of

the Report have already been disclosed. That such data is publicly available undercuts Freeman's contention that the industry regards such information as confidential.

The Mineral Report also cites THE WINNING OF NICKEL by Joseph Boldt, Jr. (D. Van Nostrand Co.1967), a book containing a detailed evaluation of the world's principal nickel deposits and mines. This book discloses the very kinds of information Freeman contends are so competitively sensitive, *id.*, pp. 25–78, including information about the former Nickel Mountain mine in Oregon. *Id.*, pp. 52–54, 181–83, 415–23. The Department of Interior's decision also observes that tonnage and grade information for nickel mines are readily available on the Internet, and routinely disclosed in press releases, industry newsletters, and statements filed with securities regulators.

Freeman has not furnished a persuasive explanation of how a competitor would likely use such information to gain an unfair advantage. Freeman argues that "[i]f any competitor knew the quality or quantity of the material I possess, they could alter their pricing structure temporarily to prevent me from successfully entering into the market." Freeman Decl., AR 198–99. That contention makes little sense in the context of the market for this particular commodity.

Freeman speculates that "competitors could use information about the value of my claims to their advantage in purchasing my interests." *Id.* I fail to see how. A prospective purchaser of Freeman's mining claims would doubtless insist on viewing the relevant test reports. If those

---

**3.** Some of that information has already been made public. For instance, Freeman seeks to withhold Figure 9–10, but similar information is disclosed in Figure 6–12, which was not redacted. Freeman seeks to redact, in some

parts of the Report, information already disclosed on page 1–7. Information that Freeman seeks to redact in one sentence on page 11–18 was disclosed in the preceding unredacted sentences.

reports were favorable, Freeman would have every reason to furnish the reports to a prospective purchaser. If those reports were unfavorable, concealing that information from a buyer would be fraught with peril.

Disclosure of the tonnage and mineral composition data could be harmful to Freeman if it furnished critics of his proposed mine with evidence supporting their contention that the site contains relatively little nickel compared to other sites being actively mined or considered for mining, and that Freeman's proposed mine would not be economically feasible to operate. The BLM made that argument in a previously released section of the Mineral Report. Freeman now asks this court to suppress the details underlying that conclusion. Exemption Four does not authorize the government to suppress information merely because release of that data might cause the public to question the need for a proposed project. That is not what is meant by "substantial competitive harm" for purposes of Exemption Four.

Freeman also seeks to redact the identity of the laboratory that analyzed the ore samples, a general description of the process used by the laboratory, the detection limits of the laboratory's equipment, the laboratory's certificate of registration, and a discussion of the method used to take the ore samples and whether that method produces reliable results. None of that appears likely to result in substantial competitive harm to Freeman if disclosed, nor does the laboratory contend that disclosure of this information would compromise its confidential trade secrets.

### 2. Other Details Regarding the Mine Construction and Operations

■ Freeman seeks to redact all information concerning the proposed rate of mining (in tons per year), estimated operating lifespan of the mine, projected hours and days of operation, and number of miles of new roads that would be constructed. It is difficult to envision any competitive harm resulting from disclosure of this information. Similar data is commonly disclosed for other mines. *Cf.* THE WINNING OF NICKEL, pp. 83–185.

The information almost certainly will be disclosed anyway when Freeman seeks to obtain operating and construction permits, along with environmental and zoning approvals. Some of the very things Freeman now seeks to withhold reportedly were disclosed in a prior environmental impact statement. The days of prospectors heading into the desert with a few mules, diverting a stream, and operating a mine without government oversight, are now history in the United States.

Freeman seeks to withhold the volume of rock that must be screened or discarded to produce a given quantity of nickel, and the estimated moisture content of the laterite ore. The latter was disclosed in the portions of the Mineral Report previously released. It is too late to withhold that information now. Nor would there be much point. Information about moisture content or discarded rock could provide limited insight into Freeman's costs of production, but a person knowledgeable about the industry could estimate that anyway. Besides, it is unclear how knowing Freeman's costs of production would benefit a hypothetical competitor. The manner in which nickel prices are set and nickel contracts traded, the high demand for nickel, the non-perishable nature of the product, and the inherent constraints upon Freeman's capacity to increase his small output of nickel, all distinguish this situation from a zero-sum game in which multiple suppliers are competing for the same business.

■ I see no basis for redacting a rough estimate of the staffing needs to operate the mine, or the equipment needed

for mining operations. Such information would be known to someone in the industry. Far more detailed information regarding nickel mine operations is available in publications such as THE WINNING OF NICKEL, *supra.* In addition, the portions of the Mineral Report already released include a BLM contractor's estimate of staffing and equipment needs to operate the mine, and a critique of Freeman's estimates. The horse has already left the barn.

A competitor could not just take the information in the Mineral Report and use it as a blueprint to open a competing mine across the street. Operating a nickel mine requires, among other things, a large deposit of nickel ore, at a sufficiently high concentration, and the rights to mine it. Such sites are in very short supply, and mining operations can vary considerably depending on site-specific factors.

Hypothetically, Freeman's equipment list might be of interest to vendors of used mining equipment, but even that concern seems exaggerated. If a seller tried to raise the price too high, Freeman presumably could adjust his shopping list. In addition, it likely will be years, if ever, before Freeman actually commences mining operations. Anyone hoarding a front-end loader to sell to Freeman could have a very long wait.

### 3. Details Regarding the Extraction of Metals from the Ore

Freeman seeks to withhold details of how he would extract metal from Nicore laterite ore. The basic concepts of extraction are widely known within the industry. *Cf.* THE WINNING OF NICKEL, pp. 387–453 ("Extractive Metallurgy of Oxide Ores").

██ A few items here warrant closer scrutiny. One is Freeman's alternative ideas for extracting metal if DART proves impractical. At first glance, these pages outline prospective transactions and nego-tiations with third parties which, in theory, could be damaging if disclosed. On closer examination, everything mentioned is at least a decade old. Nothing in the record suggests those transactions are still being considered today. In addition, the section headings convey important information that was not redacted. Freeman argues that the mere disclosure he may be considering some such transaction, someday, somewhere, places him at a disadvantage because vendors of such sites would know he was interested. Under the circumstances of this case, the harm is too generalized and conclusory to satisfy Exemption Four.

Freeman next argues that "[i]f competitors obtained access to processing or mining techniques, my plans could be exploited to my disadvantage. Competitors could adopt my techniques so as to reduce my competitive advantage or they could criticize my techniques in competition over potential sales." Freeman Decl., AR 199–200. The latter may be the primary concern, in BLM's view. Some of the information Freeman provided is not original anyway, but copied from published books.

██ Freeman seeks to redact a statement concerning the estimated heat value of wood waste, measured in BTUs per pound. The heat value of wood waste—which may vary by species—is generally public knowledge. Freeman points to nothing unique about this particular wood waste that justifies withholding this information.

██ Freeman is not entitled to redact the estimated quantity of slag that would be generated, or the price per ton his cost estimate presumes he would receive for that slag. That estimate was a hypothetical scenario. The market for slag, at the applicable time and place, will determine the actual price, or whether there even are any buyers for Freeman's slag.

The composition of the slag (Table 12–2) does not disclose any information regarding Freeman's proposed processing method not already disclosed elsewhere.

 Freeman has not shown sufficient justification for withholding the estimate of electrical power that would be consumed per ton of ore processed; the discussion of other heat sources that potentially could power a furnace; or the discussion of equipment, facilities, and staff that would be needed, except as specifically stated above in the context of DART. The discussion is relatively general, and the information obvious to those in the industry. More detailed information than this is available in published books and articles.

 Freeman has not established sufficient justification for withholding the results of tests using various methods to extract metal from Nicore laterite ore. Those tests did not include Freeman's DART process. At most, disclosure could reveal such things as the mineral composition of the ore, and the amount of rock and moisture per ton of ore. I have already determined that this information is not exempt from disclosure.

### 4. Plans to Produce and Market Stainless Steel from the Mined Material

 Defendants are not required to redact the value of nickel and chromium, in Nicore laterite, as compared to the total value of the resulting stainless steel (as a percentage). Metal prices are already public. What might implicitly be revealed is the chemical composition of Nicore laterite ore, but I have already determined that this information should not be redacted.

Whether Defendants may disclose the specific type of stainless steel Freeman proposes to produce is a closer question. Or at least it was a close question, until the court discovered this information was included (albeit inadvertently) in the portions of the Mineral Report previously released. As that information no longer is confidential, it may not be withheld.

Nor may Freeman prevent Defendants from disclosing how much purchased nickel and chromium Freeman must add, to the metal recovered from the Nicore mine, to produce a given quantity of stainless steel. Even if that information could reveal the type of steel Freeman intends to produce, that is now public anyway.

 The government may disclose the estimated market price for the steel; estimated cost for electrical power used in smelting operations; estimated capital and operating costs; and estimated cost to produce each ton of nickel or stainless steel. Those figures are important in evaluating the feasibility of the proposed mine, and whether Freeman qualifies for a mineral claim patent. The public has a strong interest in scrutinizing agency decisions that grant or deny applications for title to valuable public mineral lands under the Mining Act of 1872.

Freeman has not provided a persuasive explanation of how he would suffer substantial competitive harm if those estimates were revealed. Some figures, such as the cost of electricity in that part of Oregon, are public knowledge. In addition, most of those figures are, by now, rather stale. The Mineral Report sought to evaluate the feasibility of mining these claims as of 1994 and 2000, which (for reasons not relevant here) were deemed the relevant dates. The Mineral Report does not include Freeman's projection of the future cost of electrical power, labor, and other expenses, or the future price of nickel. Revealing Freeman's confidential projections for the future would be of greater concern, but the Report contains no such projections.

*Conclusion*

Defendants shall redact Freeman's descriptions of DART (e.g., pp. 10–21, 12–5 to 12–7), and his list of equipment required for the DART process (p. 12–9). In all other respects, the decision of the Department of Interior is affirmed.